McKinney, J.,
delivered the opinion of the Court.
This is rather a novel case, in all its features. The original bill was filed in the names of the complainant, Mary T. Johnson (as wife of the defendant, John Johnson.) and her three children, the issue of a former marriage. It is in the nature of a bill quia timet, to restrain the defendant from removing or disposing of certain slaves, named therein; and also to have the construction and legal effect of a written instrument, executed by said Mary T., before her marriage with the defendant, purporting to dispose of said slaves, declared by the Court.
The bill alleges that the complainant, Mary T., is the toife of the defendant, and that they were married in March, 1835: that prior to said marriage, she was the owner of six slaves, and that in pursuance of an anti-nuptial contract with said Johnson, she made what is called in the bill, “a deed of gift, or bill of sale,”, of said slaves to her co-complainants, — the three children of the former marriage, — reserving a right to their services during her lifetime, if she should call for, or need their services; and that said instrument was executed, and the possession delivered to her children, before her marriage with the defendant. It is charged that the defendant was wrongfully claiming to be the absolute owner of some of said slaves; and that he was threatening to dispose of the same.
The instrument referred to, is, in form, a testamentary *628 paper, and not a “deed of gift or bill of sale,” as described in the bill; though it was understood, and such, was the intention of the parties, that it should operate as a conveyance- of a present interest in the slaves, subject only to the right of the donor to reclaim the services of the slaves during her life, in the event she should think fit to do so; but which she seems never to have done, prior to the filing of the present bill.
The defendant, in his answer, claims to be the absolute owner of said slaves. He alleges, that, shortly after the marriage, he, at the repeated and urgent solicitations of his wife, purchased certain of said slaves from the children, to whom they had been given by said instrument, on the ground, that the slaves refused to live with the children; that he paid a valuable consideration for the slaves to the respective owners, all of whom were then of full age.
After the original bill had been answered, namely, on the 23d of August, 1858, the complainant, Mary T., filed what is called an amended bill, in her own name, in which she states, that since the filing of the original bill, she had made the startling discovery, that she was not the toife of the defendant, and that the supposed marriage was a nullity; and that, immediately on making this discovery, she had withdrawn from his bed and board. She charges, that the fact, upon which the invalidity of the marriage depends, was fraudulently concealed from her by the defendant; and only came to her knowledge on taking the deposition of the minister by whom the pretended marriage ceremony was performed. And asks to have the marriage declared void, and to have her slaves restored to her, and an account of hire, &c.; and denies the *629 right of her children to sell said slaves, inasmuch as the testamentary paper referred to, was inoperative to divest her, during her life, of her title to the property.
It appears, from the admission of the defendant in his answer, and from the proof in the cause, that on Sunday, the 29th of March, 1835, the marriage ceremony was pronounced by a minister of the Methodist denomination, according to the formula prescribed by that Church. But the clergyman states, in his deposition, that he performed the ceremony without any license: that he was ignorant of the law, and acted upon the representation of the defendant, that it would answer as well to get the license after-wards; that the defendant, at the time of the marriage, gave him the money to obtain a license, and in a few days after the performance of the ceremony, he procured license from the Clerk of the County Court, in regular form, and endorsed thereon the fact and time of the marriage, and returned the same to the Clerk, as directed by the Statute.
The defendant states, in his answer, that he had been a Justice of the Peace for a number of years, and had several times married persons in this manner, fully believing it to be legal. And there is evidence in the record tending to show, that a notion prevailed in the neighborhood, that such a marriage was lawful and valid.
That the marriage in question was believed to be a valid, lawful marriage, both by the complainant and defendant, the clergyman, and all concerned, can admit of no 'reasonable doubt, from all the proof in this record. There is no just ground for the charge of fraud, or concealment of the fact of want of license. The complainant cannot be hoard to allege ignorance of the law; and *630 it may fairly be presumed, from the proof, that she was fully informed of the fact, that the ceremony was performed without a license.
Upon the foregoing facts, it is insisted for the complainant, that she is entitled to have the marriage declared void, and to have said slaves restored to her, on the ground that the paper, by which they were disposed of, being testamentary in its nature, her title was not divested. And the Chancellor so decreed.
We think the decree is erroneous. It seems to us, that, whether the complainant shall be held estopped to deny the validity of the marriage, or otherwise, the result must be the same, as respects the present bill. In neither view can it be maintained.
It seems to be supposed, that the cases of Bashaw vs. State, 1 Yerger’s Rep., 177, and Grisham vs. State, 2 Yerger’s Rep., 589, establish the general and unqualified proposition, that the common law mode of solemnizing the matrimonial union, is abrogated absolutely by our statutory provisions; and that a marriage in that form is of no validity in any case whatever. Whether this conclusion can be sustained, either upon sound principle, or weight of authority, we need not now stop to consider. For the purpose of the present determination, it might be conceded, (though we express no opinion upon the point,) that the marriage was illegal, for want of compliance with the formalities prescribed by the Statute. But, if this were admitted, still, the question arises, can the complainant, in a proceeding of this nature', be permitted to deny, or impeach its validity?
For nearly a quarter of a century before the filing of this bill, the parties had cohabited as husband and wife, *631 believing all that time, that they had been lawfully married, as did all others with whom they had intercourse. And the question, whether, after so great a lapse of time, such a marriage can be declared void from the beginning, is one in which not only the parties, but the public also, have a deep interest, in view of the consequences, as affecting the status of children born of the marriage: the relations of affinity and consanguinity which may have sprung from it; the rights of property, which may have been acquired on the faith of it; and all the consequential rights, obligations, and duties growing out of it.
Upon established principles, and analogies of the law, we think it may be held, that, under the circumstances of this case, a lawful marriage, for all civil purposes, will be conclusively presumed; and that neither the parties themselves, nor third persons, perhaps, will be heard to disprove or deny the marriage.
It is a familiar doctrine, that in all cases, except prosecutions for bigamy, and actions for criminal conversation, a marriage may be presumed, or be established by reputation, after the lapse of many years: 6 Yerg., 364; 4 Humph., 480.
And the principle is equally familiar, that where persons have represented themselves to be married, or have assumed the relation of husband and wife, cohabiting and holding themselves out to the public as such, though not in fact married, they will, when it is sought to charge them with any of the civil liabilities growing out of that relation, be conclusively presumed to sustain such relation to each other; and will not be permitted to disprove or deny the marriage: 1 Greenleaf’s Ev., sec. 27, 207. It is laid down by Starkie, that in an action against hus *632 band and wife, it is sufficient to prove the marriage de facto, by evidence of cohabitation, acknowledgment, or reputation; aud they cannot prove in defense, that they were not legally married: Starkie’s Ev., 2 vol., 691, (3 Am. ed.;) 2 Salk., 437; 4 Pickering’s R., 220.
Whether or not such persons can acquire rights as against others, it is clear that others may acquire rights against them. And the principle of estoppel, upon which this doctrine rests, and which is based upon principles of morality as well as of public policy, must be held to apply equally to both parties; the woman in such a case, is no more privileged to commit fraud, or crime, than the man.
And if they are estopped, as to third persons, why shall they not, as against each other, in all civil cases, be also precluded from gainsaying the marriage? Do not the same reasons of morality and policy apply in the one case as in the other? And more especially should they be held to be estopped, as between themselves, when either is .seeking to disturb or defeat rights, which may have been acquired by the other, either directly or indirectly, on the faith of the marriage.
In the case of Devall vs. Ledbetter, 4 Pick. R., 220, which was an action of trespass for breaking and entering plaintiff’s close, it appeared that the land of the reputed wife of the defendant had been taken and extended upon the rents and profits, for the term of four years, as the freehold of the defendant in right of his supposed wife. To defeat the title thus acquired, the defendant attempted to prove the invalidity of the marriage. A marriage in lawful form had taken place, but the parties being within the prohibited degrees of kindred, it was *633 void under the Statute. It was held, that the defendant could not set up the illegality of the marriage as a defense to the action; that it would be contrary to moralty, as well as the policy of the law, to permit him to claim any right, or exemption, on account of his own crime.
In the case of Wilkinson vs. Payne, 4 Term, Rep., 468, which was an action on a promissory note given to the plaintiff, in consideration of his marrying the defendant’s daughter, the defense was, that though there was a marriage in fact, it was not a legal marriage. On the trial, it was left to the jury to presume a subsequent legal marriage, which they accordingly did. And the Court of King’s Bench were unanimous in refusing a new trial. Ld. Kenyon, in delivering the judgment, said: That though the first marriage was defective, a subsequent one might have taken place; that the parties had cohabited together for a length of time, and were treated by the defendant himself as man and wife; and these circumstances afforded a ground on which the jury might presume a subsequent marriage.
In Phillipps on Ev., 2 Vol., 286, (ed. of 1843,) it is said, the usual presumptive proofs, arising from the cohabitation of the parties as man and wife, have not been taken away by the marriage act. And that, although the existence of license, or publication of bans, may be disproved, yet, even in such a case, there may be sufficient ground for presuming a subsequent legal marriage, from the cohabitation of the parties as man and wife, and other circumstances: 1 Black. Rep., 367; Parks, N.P. C., 232.
Upon the principle of these cases, it would not be going too far, perhaps, to hold, that in a case like the present, after the lapse of more than twenty years, the presumption of a subsequent legal marriage, ought to be *634 regarded as a conclusive presumption, not subject to be disproved.
But the case under consideration is much stronger than any of the cases referred to. Here, there was not only a marriage in fact; but a marriage, that, according to the common law, as well as the law of nature, and the revealed law, was, perhaps, valid. It was only defective in wanting one or other of those formalities prescribed by Statute, which were mainly designed to give notoriety and perpetuate the evidence of the marriage. And this marriage has been followed, as before observed, by an uninterrupted cohabitation for nearly a quarter of a century. In addition to all this, a license regular in form, corresponding in date, and in all other respects, with the facts of the marriage, and attested properly -by the minister who performed the ceremony, is shown to exist in the proper office, as required by the Statute. Now, in view of all these facts, while we do not feel called on to go the length of asserting, that the subsequent procurement of the license, had the effect, by relation, to cure the defect, and make the marriage valid cib initio, yet we hold, that, in addition to the presumption of a subsequent legal marriage, the parties and all other persons, are positively concluded, after so great a lapse of time, from going behind the lieense to question the legality of the marriage; and that, at least, for all civil purposes, the marriage must be conclusively taken to have been a lawful one.
But, in the next place, if the complainant were at liberty to impeach the validity of the marriage; and if it were admitted to be void; and if it were likewise conceded that the testamentary paper referred to, by its own proper force, divested her of no *635 title to the slaves, during her life, still, it - is clear, she could have no relief.
The proof establishes the fact, that, some two or three days prior to the marriage, she actually delivered the possession of the slaves to the donees, as a gift, to hold as their property, respectively, subject to a conditional right to their services during her life, which she never asserted. She was then a feme sole, and free from all disability. The donees severally held the slaves, from the time of the gift, as their own absolute property, and this too, with the full knowledge of the complainant. And, in addition, in the course of from one to four years after the gift, she procured the defendant to purchase said slaves from the donees, absolutely, as the proof fully establishes; since when, the defendant has claimed and held them as his own, against all persons. Now, upon this state of facts — assuming that the marriage was a nullity — is it not perfectly clear that the complainant can assert no right to the slaves? If the Statute of limitations did not begin to run against her from the moment the possession of the slaves was delivered to the donees, as it probably did, from the proof in the record, it is very clear that it did commence running from the time the slaves, by her own procurement, were delivered into the possession of the defendant, under- an absolute purchase. Her. act, in procuring the defendant to purchase the slaves, was not only a ratification of the previous gift to her children, it amounted, likewise, to a waiver of her conditional right to reclaim the services of the slaves.
Such is the inevitable result, upon the hypothesis that the marriage was void.
•The decree will be reversed, and the bill dismissed.